Okay, we are resumed in the case of Rieman v. Vasquez and Johnson. And I think, Mr. Hardeen, I think you're first, right? Yes, Your Honor. Please proceed. Your Honors, I'd like to reserve three minutes for rebuttal, please. You're on the clock. We'll try to help you. Will do. Thank you. Your Honor, I think the case is pretty straightforward. If a social worker has a reasonable basis to conclude that a parent is evading service, where there's evidence of harm to the child, they have a difficult decision to make. We don't want to peremptorily remove children from their parents if there's not a basis to do so. We also don't want to make the wrong call and have a case turn out differently than this case did. We don't want to have the parent ultimately flee jurisdiction and harm come to the child. That's all true, but in this case, if I understand the facts correctly, your clients initially tried to have the, I guess it was Ms. Vasquez served. I'm sorry. I'm trying to think who it was. Was it Sidney Rieman that was served? Yes, Your Honor, that's correct. Four different times, but that was even before the later proceeding was supposed to be notified. There was nothing on any of the service information about the time, the place of anything. It theoretically hadn't even been contemplated. And under California law, it's very clear that you have to notice these hearings. So let me just ask you this. Is there any question in your mind that had your clients said to the judge, we have not served this woman, she has no idea when and where this is going to be, is there any doubt that the judge would have continued the hearing until she had been served? If that's all they had said, that is correct. I believe that's exactly what would happen, but I think the facts are a little bit different here. Because here we have a record demonstrating evasion of service. And what we know, that's from the four attempts. That's from the four attempts that were made, and it's from comments that were made to Deputy Delgado over the phone with Mr. Moran, where Mr. Moran advised that they were concerned about DCFS taking custody of the child. They had a phone number that was different than the one they put on the court's information. They never tried to call. The family tried to call. Nobody responded. It just doesn't seem to add up. Well, there was a response. Vasquez did call back Mr. Moran. They did have a conversation where, you know, the perceptions of the conversation and what drove it, they are different, but that's understandable. They have two different perspectives. From my client's perspective, what happened is that she was speaking with Mr. Moran and then requested to have Ms. Freeman contact us, please have her contact us, and then the phone went dead, seemingly. You know, no service. Did they call her cell number? No, they never said that they did. Didn't they do that? Well, I think, Your Honor, the question is whether or not, does a social worker have to call that specific phone number if they've already made diligent attempts? Did they mention to Mr. Moran that they were going to have this hearing? They did not. That's the record, Your Honor. I have to come away with the impression that, like, they were kind of keeping that from. . . I mean, I get your point. From their, let's assume for sake of argument, that from their perspective, they were, their perspective was that she was going to try to avoid service, try to avoid any of this happening. Yes. So I could see where, you know, you might, if you work for the government, you might want to think, well, we want to kind of keep them in the dark a little bit. But you don't get to keep. . . I mean, but that's a problem, isn't it, for you? If we come away with the impression that they were trying to keep them in the dark about this notice, about this hearing, that's a problem. That's a problem. But I think, again, the question is whether or not a social worker has discretion under absolute immunity if they're attempting to initiate a dependency proceeding. Do they have discretion to choose the method of service based upon the facts as they perceive them? That's one way to frame it. But do you think they have discretion to try to not give, to try to not, to try to keep them from having actual notice of a coming hearing that will take away their child? No, they don't, Your Honor. And, in fact, if we look at the procedure that governs the service of a detention warrant and then the subsequent initiation of a dependency proceeding, had they been able to serve the detention warrant, the first thing that would have happened is that they immediately would have taken possession of the child. It would have happened right away. And at that point, they would have filed for a detention. . . Mr. Jardine. Dependency proceeding. I'm sorry, Your Honor. Mr. Jardine. It's Jardine. Thank you, Your Honor. I have a problem here that maybe you can help me with. This was a ruling by the judge in district court and a motion for summary judgment. Yes. You've indicated that there was some evidence of evasion of notice. The questioning from one of my colleagues indicates that maybe there was an attempt not to give notice. It sounds to me like there's a triable issue of fact here. Well, that's a good point, Your Honor. But that creates some really interesting questions procedurally, I think. Because if indeed the trier of fact were to find that everyone, the stepfather, who all of a sudden lost contact or lost coverage when he was asked to communicate with Ms. Ryman, and Ms. Ryman, who confessedly was hiding out in a different county in a hotel, if the trier of fact were to find that Ms. Ryman and her family were avoiding actively and affirmatively avoiding service, then the giving of notice was impossible. Your Honor, I mean, that's essentially what I'm attempting to argue, which is that— Isn't that a question of fact, of whether they were or whether they weren't? Well, you know, I think we can look at that from multiple perspectives. And, you know, through the lens of qualified immunity, the question becomes whether under existing precedent, if a social worker reasonably concluded that given information that they had gathered that suggested there was an active attempt at evasion— If there's a question of fact as to whether notice can be given, the first step in qualified immunity, which is a violation of a constitutional right, isn't met. Understood, Your Honor. Yeah. I'm sorry, Your Honor. I'm missing something. Go ahead. No, Your Honor. The district court found that there were no disputed issues of fact and entered summary judgment against my client. Now, obviously, we would like to see that ruling overturned, but I think we come into a procedural question, which is what the scope of this court's review is. If the court determines that there are potentially disputed issues of fact, which would prevent its review on qualified immunity, does that then prevent the court from looking at the grant of summary judgment in favor of the plaintiff on, in essence, the exact same record? And so then is the potential remedy here, is this court's action not to award me the victory that I'm arguing for but instead to say you both lost and this has to go down and be tried? Do I understand your position? You seem to be implying, okay, rule against me on absolute immunity and qualified. Let's go back to trial and we'll try the whole issue. Is that what you're saying? Well, it sounds better than where I'm sitting right now. Thank you, Your Honor, coming into the hearing. And that is a potential, and that is a possibility which is raised by Judge Bea's question, and I can't deny that that is a potential outcome. But, you know, the other framework I think that we can apply to that question, however, becomes, you know, this is an objective analysis and it's not focused on Ms. Freeman. It's focused on the social worker, whether or not they have been objectively reasonable. So, at least as I see it, your client's asked for absolute immunity, which, of course, flows only from a legitimate prosecutorial decision. Yes. The record shows that on the initial attempts four times, I believe, there was no indication of where and there would be any adjudication, time, place, who to contact, anything like that. That's correct. So even if it had been served, they wouldn't know. You apparently had Ms. Ryman's phone number, never called. Those kinds of things suggest, as my colleagues have pointed out, that there was a deliberate attempt to avoid serving her. Now, I don't know whether that's true or not, but the reality is we have to deal with what we got. If you're saying, you know, I give up these immunities, send it back to trial court, then that makes our job a whole lot easier. Is that what you're saying? No, that's not entirely what I'm saying, Your Honor. What I'm saying is I'm recognizing Judge B's point, which is well taken, I think. But what I'm trying to bring back to is to say that if we're looking at this through the lens of qualified immunity, the simple question presented here is if you have a reasonable basis to conclude that someone is evading service while you're serving a detention warrant under California law, and if that process provides that in the successful service of a warrant, then you will get an opportunity to right then and there to provide notice because once you serve the warrant, you can file the petition, you get a hearing date, it has to be heard within three days, she would have been served had she not been evading service. If that's what you've been attempting to do and you've concluded that she's evading, do you have to then perform, for example, one additional trip out to the same house, you already suspect she's not there, she's the only person who doesn't call you, I'm sorry, Your Honor. I understand where you're going with that. No, but all that is a disputed issue. I don't think they can concede that they were trying to evade service. So, I mean, we have cases about qualified immunity that we don't grant qualified immunity in or absolute immunity if there's a disputed issue of fact that goes to whether or not you'd have immunity. So, you know, how could you, why wouldn't we send it back, under your current position, why wouldn't we at least send it back to the district court to say, you need to decide whether they were, you know, hold a hearing, whatever, and decide whether they were trying to evade service and then, you know, plug in whatever law the district court wants to plug in on that. I still don't see how you get us to reverse and say you have qualified or absolute immunity under your position given that, unless you just disagree that it's a disputed issue of material fact as to whether they were trying to evade, as to whether they were trying to evade process. Well, the question is whether or not the social worker's perception that they were attempting to evade service was reasonable. So you have the four attempts. You know that Mr. Moran is viewing them through the home security cameras, knows they're there with something to serve. They've got a packet with them. He calls them afterwards to discuss it. During that conversation, he tells Deputy Delgado he makes reference to the fact that they don't want DCFS to take custody of the child. That sounds like a reasonable basis to conclude. She's evading. Now, let's assume that she wasn't actually evading. Let's say that the story that they gave later on the 14th was correct and, in fact, she had a preplanned vacation and she was just gone. Let's assume that. My client doesn't know that. So if they know that they're not at home to receive service but they're aware that someone's attempting service, if they've expressed concern that DCFS is going to seize the child, Ms. Freeman's mother is a nurse. She's a required reporter. She's a mandatory reporter. She knows exactly what happens when a report like that is issued. It's not unreasonable for the social worker to conclude, based on those facts alone, that she is evading service. But, as my colleague pointed out at the very beginning, this is a triable issue of fact. It's a disputed issue. And that's, I think, what you got with the district court. You had evidence presented by both sides. The district court concluded that as to these two issues, absolute immunity and qualified immunity, you lose. And it's partly because it's based upon triable issues of fact, right? No. She granted summary judgment in favor of the plaintiff on basically the same record. She did not find that there were disputed issues of fact. I misspoke. I'm sorry. I'm not trying to cut you off. Yeah. Right. Yeah. I mean, which brings us here. I mean, if the court had— Not you, but that your client had misled the court, right? That's what she had concluded, was that the statements that your client made to the court had misled the court. Yes. Not her whereabouts being known. I do. I wanted to address judicial deception really just very, very briefly. Use your time however you wish, but you don't get more. Thank you, Your Honor. I'll be very quickly. With respect to judicial deception, Your Honor, there's not a single false statement contained in the detention report or anywhere else. And the fact that there was the wrong phone number listed, there's no representation that they attempted to call that number and it was the wrong number. That's not material. I don't understand the finding of judicial deception. There are literally no misstatements. They didn't say we tried to serve the detention notice and we were unable to. I thought that they put a wrong number on the court papers but had the correct number. Is that mistaken? No. The number appears—there are two different numbers that are listed, but again, there's no representation that they were unable to reach or that they attempted to and had a wrong number. That is not material. It does not come into play. Or it wasn't represented. It wasn't represented. My understanding is you're saying it's not material because you're saying it shouldn't matter. It shouldn't matter if they did all that other stuff. I am. Is that right? I've got 30 seconds. I'd better be quick. Okay. Very well. All right. Mr. Cox, I believe. Thank you, Your Honor. May it please the Court. First of all, Your Honor, I'd like to disabuse the Court of the fact that there was no judicial deception. Speak up, Mr. Cox. I'm not getting it. I'm sorry. I'm sorry. There was absolutely judicial deception in this case. And the judicial deception in this case had to do with what was put in that detention report, which was one of the things we're here to discuss today. They never told the Court that my client had tried to call the office between September 7th and September 11th 11 times. They even have a note in their own file that said that Mr. Would you repeat that?  I'm so sorry, Your Honor. I have a cold. That was the reason I was wearing a mask over there. So I was trying not to infect the entire courtroom. I said from September 7th to September 11th, my client called the CPS, called the CPS office. Simon called who? She called the CPS office 11 times trying to get some information on what was going on. They have a note in their file, CPS does, that says that Mr. Moran, the step-grandfather, had called numerous times trying to get information about what was going on. That was on the 10th of September. On the 11th, when Ms. Vasquez called back, she doesn't tell Mr. Moran that there's a hearing the next day, that there's going to be a hearing. And that hearing could result in my client having her parental rights permanently terminated. That's one of the things that appears right on the face of the petition. She also doesn't tell the court that they had Ms. Ryman's actual telephone number and never tried to call her. Now, you know, as far as Detective Delgado is concerned, in his deposition, Detective Delgado does not say that he told Mr. Moran that the social workers were trying to serve them with papers. All he says, first of all, he says he doesn't really recall what he told Mr. Moran, but what he does say is that he calls back and asks Mr. Moran, can I give the social worker your telephone number so she can call you? And Mr. Moran says, yes, please. Have them call me. They have no idea that there is a detention warrant out there. The last they knew when they left that office on September 7th was that the social worker supervisor, Johnson, told Ms. Ryman that whether she had her son evaluated at LLUMC, Loma Linda University Medical Center, or whether she went to her own doctor was up to her, completely up to her. That's in their notes. And she told them before she left that she intended to let her doctor evaluate the boy, and if her doctor recommended that she have a CT scan, then she would follow her doctor's recommendations. What's your response to opposing counsel's allegation that the process servers were seen in some kind of a home monitor, they knew who it was, and there was a discussion from somebody at DPS with the father talking about that, and he said that they didn't want to get involved. Is any of that correct from your perspective? It is not, Your Honor. As a matter of fact, Mr. Delgado or Detective Delgado said he doesn't recall what he said, and my client hotly disputes that. That is just something from Ms. Vasquez's feverish mind. That is nowhere in any record anywhere. It's nowhere. It's not written anywhere. This is just something that Ms. Vasquez. Cox, do you dispute that there's some evidence that your client was attempting to avoid CPS? Absolutely, Your Honor. Go to a hotel in a different county for the purpose of hiding? What she did was she was actually at Riverside. She was at Desert Regional Medical Center when CPS first came to the house with the deputy sheriff. And by the way, she didn't see CPS. She only saw the deputy, and she didn't see him at all. It was her father that saw him. She saw him on the ring doorbell. That was what you were alluding to before, Your Honor. And so when my client's father went out, he didn't see it initially when it happened because he was inside the hospital and the reception wasn't good. He went outside, saw that there was a call on his ring doorbell, saw that there was a deputy. This is in Yucca Valley. It's a very small place. He actually knew the deputy. So he calls the sheriff's department, asks the sheriff's department to have the deputy call him back. The deputy calls him back about an hour later and says, I was here with CPS. They have some papers for you. And doesn't say there's a warrant. Doesn't say they were going to pick up your child. Doesn't say anything. And again, keep in mind that when my client left that CPS office that afternoon. I think you answered my question. Did she go from her house to a hotel in a different county for the purpose of hiding out? She didn't. The technical answer is yes. Okay. So the technical answer is yes. But what she did was her parents weren't going to be home the next day. And you have to look at this in the context that the trial court looked at this. There had been a very abrasive and abusive conduct by Ms. Vasquez that morning. And she didn't want that. Should the trial court have submitted the issue of whether she was avoiding service to a trier of fact rather than determining on summary judgment? That wasn't the issue that the court found, Your Honor. What the issue the court found was that the social service did not give notice of the. You can't give notice to a person who is evading service. In this case, you could have easily picked up the telephone and called her. Leave a message on her voicemail. They picked up the telephone and called the stepfather. And he said, oh, I'm out of range all of a sudden. Your Honor, that is absolutely untrue. You say it is. They say it isn't. Isn't that an issue of fact? Well, Your Honor, really, there is no issue of fact that they never called my client ever. So there's an affirmative duty on the part of CPS to call your client in order to give notice. That's your position. It is absolutely. Do you have a case saying that? It is absolutely an affirmative duty. Well, here's what their policies and practices of the county of Riverside or the county of San Bernardino. The affirmative duty exists even though they think that she's trying to hide? Yes. Yes, it does. And that's because she'll answer wherever she is and say, I'm hiding? Well, no, Your Honor, because what they were trying to serve on her on the 7th and the 8th was a warrant to remove her child. What they didn't give her notice of was a hearing. They give notice for an ex parte order, do they? No, they don't. But what they didn't give her notice of was a hearing on the 12th of September. And their story as to why they didn't give notice was that she was trying to avoid service. And, Your Honor, all they had to do was pick up the phone and call her. And, again, they called 11 times to CPS trying to get information. This is not in a vacuum. This is not like my client is, you know, just sitting back there in Riverside trying not to have contact with CPS. But, again, maybe I misunderstood. You answered my call, Aiden. Ms. Rimo was in a hotel in another county intentionally trying to evade service, right? She wasn't trying to evade service. She was trying to evade the social worker. She had no idea what the social worker wanted. Whatever. She knew they were trying to get in touch with her. Correct. You say that they tried to call back 11 times. She didn't, right? It was on her father. No, no, no, Your Honor. She was there every single time. And she actually, we submitted some telephone records. There are records from her father, her stepfather, from her mother, and from her. She is with her stepfather and her mother every time she calls. Okay. So let's take what you're saying, take what your opposing counsel is saying. What do we do with this? Do we send it back? Do we deny absolute immunity, deny qualified immunity, and send it back? Is that what we do? Well, certainly there's no absolute immunity. Process services do not have absolute immunity, and that was the function that the social workers were. The claim is part of a prosecutorial decision, which can, in certain circumstances, produce absolute immunity. But in this case, I'm just asking you, what do we do? Well, I think that under the circumstances, Your Honor, the trial court found that the fact that my client was in a hotel room is irrelevant. First of all, CPS had no idea that she was in a hotel room. They had no idea where she was. But she was trying to evade service. She was not trying to evade service, Your Honor. She was trying to evade having personal contact with that social worker. She had no idea that they had a warrant to remove her child. Why did she call the office then? She did. Why did she? She called the office because her father had seen the deputy in the— And when she called, what was the purpose of calling? To find out why he was there. He told her that CPS was there to talk to her. And he said, and the deputy said, can I give CPS your phone number? He said yes. And have him call me, please. Or have him call Sidney. So this is—again, you have to take this in the context of what happened on the morning of the 7th of September. On the morning of the 7th of September, my client was being badgered by this social worker. That's the reason she asked to speak to the supervisor. You know, when she finds out that that social worker is back at her door again that night, they spent the next four days making 11 telephone calls to CPS trying to find out why that social worker was there. And she was being badgered by the social worker. What was it the social worker had done or said to her that she felt was improper? Well, first of all, when the social worker got to the door, the social worker said, I know you, I don't think I can do this, and stomped away. And my client had no idea who this person was and had no idea what was going on. They don't get to pick their social workers, do they? What's that? No, no, no. They don't get to pick their social worker. No, they don't. But they can actually ask their social worker to be reassigned. But then what happens is the social worker comes back and starts putting words into her mouth. To make sure—it wasn't that she said, I know you, and went to your client. It was that the social worker said, I know you, and left. Yes, yes. And then the social worker came back. Yeah, and came back and said, well, you know, my supervisor told me just to get on with this. So she started asking questions. She was putting words into my client's mouth. She was basically badgering my client. Not once did she ask to see the little boy. She didn't seem really to care about that. So then that's when my client and her grandmother said, we want to talk to your supervisor. Well, again, my colleague began in the first place. You've got a summary judgment. They claim absolute immunity. They claim qualified immunity. You've argued why that's not true. They say it should definitely be true. Other way around. But at this point, isn't this something we need to send back to district court? Well, Your Honor, you could send that part of it back with regard to the he said, she said stuff. But the fact that the social workers misrepresented facts in the delivered service log— excuse me, in the detention hearing report, that's a report to the court. It's like a warrant. And that's a question of fact. Excuse me, a question of law. That is not a question of fact. Sorry. That's a question of law. And so the fact that they didn't tell the court that they had her phone number, they didn't tell the court that she had tried to call 11 times, they didn't tell the court that the family had called during that period of time as well multiple times. Those are all questions of law. Whether or not a reasonable— You hit it on the head, Your Honor, when you said, do you think that a magistrate or a judge would have said, hey, you know, you've got her phone number. They've called 11 times trying to get a hold of your client. And you've got this note here that says that the dad has called multiple times, according to the note. Have you tried to call this young woman to find out what's going on? They didn't do any of that. And so those were material omissions in that court report, and no judge would have let that hearing go forward without that. You think your strongest case is judicial deception, right? I think so, Your Honor. Thank you, Your Honor. Thought I had 30, but it's only 29. Okay, there we go. All right. Your Honors, you know, the specific testimony from Deputy Delgado, it's in the excerpts of Record 1 EOR 68 where he says, as I can recall, I believe he was already aware that there was a warrant for the child. That's why he was expressing concern to me about not giving the child back to CPS. Now, this is all happening over that weekend. You mean the father? Yes, he's referring to Mr. Moran, exactly. So he is imputing, assuming that the father knew that. Yes, that's his conclusion. No, he's making a reasonable conclusion based upon what he's being told. Their position, it seems to be, is that she was trying to avoid the social worker, not necessarily that she was trying to avoid service. What evidence is there that they were trying to avoid service as opposed to not wanting to interact with the social worker again? Well, I guess, again, it's one of perception by the social worker. They do allege that Ms. Vasquez was harsh and inappropriate in her initial encounter. Actually, I'm just trying to figure out, is there any evidence? No, no, they were trying, they did something that was trying to avoid having service that would not also be consistent with their position, that no, we were just trying to stay away from that woman. I don't know that there's anything that affirmatively states that we were only trying to avoid her. Was she with them? You said that she was with the deputy when the deputy showed up that first time? That's correct. She was. Yeah, she went for all of the attempts. I don't know that there is a statement in the record that says, you know, that she communicated to them, I just don't want to deal with Ms. Vasquez. I'm not trying to avoid you altogether. That doesn't appear in the record, but I think the question becomes if. But she is calling. I mean, you don't dispute that she's calling the office, right? It just seems like if she's trying to completely break all contact, why would she be trying to call the office? Well, Mr. Cox. It's consistent with the idea that, like, I don't want to deal with that person face-to-face, so I'm going to try to call the office and talk to somebody else or something. It may be. But, again, when you combine it with the statements that are made by Mr. Moran, which is that we don't want them seizing CPS, I think that's something that's not disputed that supports my client's view, which is that you're evading service. You know something's coming and you're not here. And as it turns out, that's exactly what was going on. She wasn't on a preplanned vacation, as they told after the fact on the 14th. She was hiding out somewhere so that CPS wouldn't be able to affect service on her. I think that's an objectively reasonable conclusion, both after the fact and both at the time when my client submitted the detention report and argued. By my colleagues. All right. Thank you all for your argument. We appreciate it. The case just argued is submitted.
judges: BEA, SMITH, VANDYKE